UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE UNITED STATES OF AMERICA,

*Plaintiff*,

v.

THE COMMONWEALTH OF MASSACHUSETTS; MAURA HEALEY, Governor of Massachusetts, in her official capacity; ANDREA CAMPBELL, Attorney General of Massachusetts, in her official capacity; PHILLIP ENG, Interim Secretary of Transportation, in his official capacity; and COLLEEN OGILVIE, Registrar of Motor Vehicles, in her official capacity,

*Defendants*.

CIVIL ACTION
NO. 1:26-CV-12401-WGY

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Tasha J. Bahal (BBO #675935)
*Deputy State Solicitor*
Erin E. Fowler (BBO #707188)
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
Tasha.Bahal@mass.gov
Erin.E.Fowler@mass.gov
(617) 727-2200

July 31, 2026

## TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 1

A. Massachusetts' Registry of Motor Vehicle's Confidential Registration Program ..... 1

B. Factual Allegations ..... 3

ARGUMENT ..... 5

I. The Complaint Should Be Dismissed For Lack Of Article III Standing ..... 5

A. The United States Fails to Allege Any Injury in Fact ..... 5

B. The Ills The United States Complains of Are Not Fairly Traceable to the Policy ..... 9

C. The United States' Alleged Injuries Are Not Redressable by a Favorable Decision ..... 11

II. The Complaint Should Be Dismissed for Failure to State a Claim ..... 12

A. The Policy Does Not Violate the Intergovernmental Immunity Doctrine ..... 12

i. The Policy Does Not Discriminate Against the Federal Government ..... 12

ii. The Policy Does Not Regulate the Federal Government ..... 15

B. Forcing The RMV To Issue Confidential License Plates to Federal Civil Agencies Would Violate the Anticommandeering Principle of the Tenth Amendment ..... 18

C. The United States Does Not Plead Allegations Against Governor Healey. ..... 20

CONCLUSION ..... 20

## INTRODUCTION

The lawsuit involves the United States' challenge to a Registry of Motor Vehicles ("RMV") Policy that governs when and who can receive confidential license plates. The United States asks this Court to ***compel*** the Massachusetts RMV to issue confidential license plates to certain federal agencies, including to Immigration and Customs Enforcement ("ICE") and Customs and Border Patrol ("CBP"). In seeking that relief, the United States misrepresents the RMV Policy—which is facially neutral and allows local, state, and federal criminal law enforcement agencies (but not local, state, or federal civil law enforcement agencies) to receive confidential license plates in certain circumstances; includes allegations of harm far removed from the realities of what a confidential license plate is (these license plates merely restrict certain information from appearing in some databases accessed by law enforcement and limited other authorized users); and intrudes on the sovereign interests of the Commonwealth, such that the relief the United States seeks would violate anti-commandeering principles.

## BACKGROUND

### A. Massachusetts' Registry of Motor Vehicle's Confidential Registration Program

Pursuant to Massachusetts General Laws Chapter 90, Section 2, the Registrar of the Massachusetts RMV has the authority to issue confidential license plates for motor vehicles registered in the Commonwealth. *See* Addendum ("Add.") 1, at 1.[1] Confidential and standard license plates are visually identical; they differ only in database visibility. Specifically, confidential

---

[1] The Massachusetts RMV policy governing its Confidential Registration Program (CRP) is attached as Addendum 1 and the corresponding CRP application is attached as Addendum 2. This Court can properly consider these documents at this motion to dismiss stage, as they are expressly referenced in the Complaint and are central to the United States' allegations. *See*, *e.g.*, *Watterson v Page*, 987 F2d 1, 3 (1st Cir. 1993) (on motion to dismiss, courts may consider documents the authenticity of which are not disputed by the parties, official public records, documents central to plaintiffs' claim, or documents sufficiently referred to in the complaint).

license plates conceal the owner or lessee's registration information from appearing in certain databases—for example, the Department of Criminal Justice Information System and RMV systems—available only to law enforcement and authorized users of RMV databases. *Id*. In contrast, a standard license plate links the vehicle to its owner or lessee in these same databases. *Id.* Registration information for civil or criminal law enforcement vehicles—regardless of whether that vehicle has confidential or standard plates—is also exempt from disclosure under the state public records law. *See, e.g.*, M.G.L. c. 4, § 7(26)(n). Accordingly, whether a law enforcement vehicle has standard or confidential license plates has no impact on the public's access to the vehicle's registration information—in either case, there is no public access.

The only practical import of having a confidential license plate on a government-owned vehicle is that, if the driver of that vehicle is pulled over by local law enforcement, the police officer is unable to obtain any information about the registered owner or lessee of the vehicle. ECF No. 1 ("Complaint" or "Compl.") Exhibit ("Ex.") A at 2. In contrast, if that same government-owned vehicle has a standard license plate, the police officer would be able to view the government agency to which the vehicle is registered but would still not see any information regarding the driver's identity. *Id.* As the Commonwealth has explained to the United States, "the license plate of a government-owned vehicle has nothing to do with the identity of its driver or drivers." *Id*.

The RMV has issued policy guidance specifying eligibility for confidential license plates under its Confidential Registration Program ("CRP"), effective February 11, 2026 (the "Policy"). Under the Policy, government-owned vehicles may be eligible for confidential license plates if:

(i) the vehicle is owned by the Commonwealth or a political subdivision thereof, a local municipality, or a federal agency;

(ii) the vehicle is ***assigned to a law enforcement entity primarily engaged in criminal law enforcement*** or to a law enforcement entity actively participating in a joint anti-terrorism or criminal task force led by a law enforcement entity primarily engaged in criminal law enforcement; and

(iii) the ***vehicle is used for criminal law enforcement*** or eligible task force purposes, as the case may be."

Add. 1 at 2 (emphases added). This policy prohibits all federal, state, and local law enforcement agencies primarily involved in civil investigations from obtaining confidential license plates, while allowing all federal, state, and local law enforcement agencies primarily involved in criminal law enforcement investigations to enroll vehicles used for criminal law enforcement purposes in the CRP. *Id*. In addition, "[t]he requesting entity must set forth in the application specific and articulable facts that demonstrate a threat to the vehicle's intended operator(s) arising from the operation of the vehicle within the performance of official duties, and how enrollment in the CRP may mitigate that threat." *Id*. This policy is reflected in the updated application. *See* Add. 2.

**B. Factual Allegations**

On May 27, 2026, the United States filed its Complaint for declaratory and injunctive relief challenging the Policy. *See* Compl. The Complaint names as defendants the Commonwealth of Massachusetts; Governor Healey, Attorney General Campbell, Interim Secretary of Transportation Eng, and Registrar of Motor Vehicles Ogilvie, in their official capacities. *Id*. at 1. Notably, the Complaint makes no factual allegations against the Attorney General or Governor Healey, and the Attorney General has already been dismissed from this lawsuit for that reason. ECF 18; *see infra* at p. 20 (seeking same relief for Governor)

The United States alleges that "obtaining confidential registrations and license plates is critical" to its ability to enforce immigration laws because, it claims, "confidentiality" is "essential" to its agencies that perform this work. Compl. ¶ 18. The United States alleges—erroneously, as explained above—that the alternative to a confidential license plate is a "single traceable public plate" that the public "may be able to track." Compl. ¶ 19; *see id*. ¶ 35.

The United States broadly alleges that "[a]s recently as 2025, all federal agencies including

FBI, ATF, USMS, DEA, CBP, ICE, and HSI, were able to obtain confidential vehicle registrations and license plates in Massachusetts," Compl. ¶ 21, and that in 2026, Massachusetts changed its policy, *id*. ¶ 22. The Complaint does not include allegations that any specific federal agency or federal officer or agent has been harmed as a result of being denied a confidential license plate. Instead, the United States relies on general assertions about what it believes—again, erroneously—to be the potential impact of using standard license plates: "enforcement targets can sometimes track and evade law enforcement," *id.* ¶ 35; "subjects may destroy evidence, evade apprehension, flee the jurisdiction, take countermeasures that endanger the public, or otherwise alter their behavior," *id*. ¶ 36; "federal agencies may be forced to modify, delay, or forego operations, increasing risks to federal law enforcement officers and the communities they serve", *id*. ¶ 38. The Complaint does not specify how these hypothetical outcomes (based on the use of standard license plates) may plausibly result from the mere ability of authorized users of certain databases to view registration information—which includes only the name of the agency that registered the vehicle.

The United States also includes several allegations relating to "the increasing threats of targeted harassment and retaliation against federal officers and agents[.]" Compl. ¶ 42; *see generally id*. ¶¶ 42-45. It again does not specify how these "increas[ed] threats" are tied to confidential license plates, let alone the challenged Policy. *See*, *e.g., id*. ¶ 45, n. 6 (Department of Homeland Security press release regarding "Mexican criminals" that have "criminal networks").

Based on these allegations, the Complaint includes two causes of action, both violations of the Supremacy Clause, and specifically, of the intergovernmental immunity doctrine. *See* Compl. ¶¶ 54-58 (Count I), 59-64 (Count II). Count I asserts that the Commonwealth is unlawfully discriminating against the Federal Government because the RMV "policy treats CBP and ICE differently as compared to similarly situated law enforcement agencies." *Id.* ¶ 56. It also rejects

Massachusetts' explanation that its Policy "draw[s] a distinction between civil and criminal enforcement" based on its view that "nothing in its existing laws or policies draw that distinction." *Id*. Count II asserts that the "Massachusetts's confidential plate policy constitutes an unlawful regulation of the Federal Government[,]" *id*. ¶ 60, because "it directly regulates a core government function by telling federal law enforcement that they cannot obtain essential confidential plates because Massachusetts disapproves of their federal function." *Id*. ¶ 62.

## ARGUMENT

### I. The Complaint Should Be Dismissed For Lack Of Article III Standing

The United States lacks standing to bring this lawsuit. As the party invoking federal jurisdiction, a plaintiff "bears the burden of pleading facts necessary to demonstrate standing[.]" *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). To establish standing, a plaintiff must show that: (1) they have suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The United States cannot meet its burden here.

The United States' alleged basis for standing is twofold—that the Massachusetts' Policy (1) causes the United States a "sovereign injury," Compl. ¶ 31, and (2) "endangers officers and reduces operational effectiveness," *id*. ¶ 32; *see generally id*. ¶¶ 34-49. Neither standing theory constitutes an injury in fact; neither alleged injury is traceable to the Policy; and neither alleged injury is redressable by a favorable decision of this court.

#### A. The United States Fails to Allege Any Injury in Fact

The Policy causes no injury to the United States. Article III standing requires that a plaintiff have suffered "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan*,

504 U.S. at 560 (citations and quotations omitted). Allegations of injury that are "perfunctory and conclusory," lacking in "specific information . . . regarding the harm, if any, that has befallen each individual plaintiff," do not suffice. *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 120 (1st Cir. 2026) (citation and quotation omitted).

*First*, the United States asserts that where the Policy "violates the Supremacy Clause and principles of intergovernmental immunity," the policy "imposes a sovereign and irreparable injury on the United States." Compl. ¶ 31. This effort to make a purely sovereign injury the necessary injury in fact for standing fails. Even if the Policy violated the Supremacy Clause (it does not, *see infra* pp. 12-18), no authority supports the proposition that an alleged Supremacy Clause violation alone confers standing. To the contrary, cases in which the United States has invoked the intergovernmental immunity doctrine in an effort to invalidate allegedly discriminatory state laws consistently reflect obvious concrete harm to the federal government. In *United States v. Washington*, for example, the challenged state law "rais[ed] workers' compensation costs for the Federal Government." 596 U.S. 832, 835 (2022) ("Washington II"). And numerous intergovernmental immunity cases have arisen in the context of taxation, where, again, the harm is obvious—indeed, the seminal intergovernmental immunity case "held unconstitutional Maryland's effort to tax the Bank of the United States when Maryland imposed no comparable tax on any other bank within the State." *Id.* at 838 (citing *McCulloch v. Maryland*, 17 U.S. 316, 425-37 (1819)); *see also, e.g.*, *Washington v. United States*, 460 U.S. 536, 538-40 (1983) ("Washington I") (state sales tax applied to federal contractors); *United States v. New Mexico*, 455 U.S. 720, 727(1982) (same); *United States v. County of Fresno*, 429 U.S. 452, 456 (1977) (state tax on housing leased by United States to federal employees).

In short, absent the "concrete harm" required for injury-in-fact, the mere existence of an

alleged violation of federal law is insufficient for standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). "No concrete harm, no standing." *Id.*

The cases the United States cites do not support its sovereign-harm-as-injury theory. *Arizona v. Yellen*, involved a Spending Clause challenge to the so-called Offset Provision of the American Rescue Plan Act. 34 F.4th 841, 845 (9th Cir. 2022). The Ninth Circuit found that Arizona had adequately alleged "concrete and particularized harms to its ability to exercise its sovereign prerogatives," in that, "if the Offset Provision is as ambiguous and coercive as it alleges, it will face serious consequences in losing control over its taxing policies and being held to a funding offer that it does not understand." *Id.* at 852-53. In other words, Arizona's claim of "infringement on its authority to set tax policy," *id.* at 845, alleged concrete harm to the core sovereign power of taxation; no such claim of concrete injury to the United States's sovereign functions is at issue here. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, is similarly unhelpful. 529 U.S. 765 (2000). There, while upholding a *qui tam* relator's standing to sue to remedy injury to the United States—namely, fraudulent activity resulting in the federal government's "disburs[ing] more grant money than [the grant recipient] was entitled to receive," *id.* at 770—the Supreme Court recognized an "injury to [the United States's] sovereignty arising from violation of its laws (*which suffices to support a criminal lawsuit by the Government*)[.]" *Id.* at 771 (emphasis added). But the Court's observation that the allegations there could support a *criminal* action distinguishes that case from this one, where no criminal violation is at issue. A crime is "an offense against the sovereignty of the government" that authorizes the government to proceed in court against the offender. *Heath v. Alabama*, 474 U.S. 82, 88 (1985). That principle has no application here.[2]

---

[2] Indeed, as recent decisions have recognized, there are several practical reasons to reject the United States' broad sovereign injury argument. *E.g.*, *United States v. City of Bos.*, 2026 WL (footnote continued)

*Second*, the United States's effort to allege concrete injury in fact beyond the "sovereign injury" discussed above is patently inadequate. Although the United States alleges the Policy "endangers officers and reduces operational effectiveness," Compl. ¶ 32, it ***does not cite a single example of a specific harm*** that it has actually suffered. Instead, the United States resorts to generalities. For example, the United States broadly alleges that the policy "jeopardize[es] ongoing investigations," *id.* ¶ 34, "disrupts a multitude of mission sets that require operational anonymity," *id*. ¶ 37, and "increase[es] risks to federal enforcement officers and the communities they service, *id*. ¶ 38. But the Complaint does not provide any allegations—let alone well-pleaded ones—that these hypothetical impacts have come to pass; indeed, there is no example of any investigation or mission that was disrupted, *id.* ¶¶ 37, 38, or any federal officer or agent that had their identity compromised because the RMV denied a federal government vehicle a confidential license plate, *id*. ¶¶ 37, 47. Given how the confidential license plate program actually works, *see supra* pp. 1-3, any such assertions are implausible as a matter of law. *Cf. Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 & n.3 (1st Cir. 2012) (in conducting Rule 12 review, court may consider "implications from documents attached to or fairly incorporated into the complaint . . . [k]nowing that the documents may trump the complaint's allegations if a conflict exists") (citations and quotations omitted). The United States' hypothetical, vague, and overly broad allegations do not plausibly establish injury in fact.

---

1493706, at *9 (D. Mass. May 28, 2026) ("[The United States] suggests that any official statement opposing federal policies or positions suffices to provide the United States standing to seek an injunction, even if the statement lacks any practical effect. The United States cites no on-point authority for this essentially limitless view of sovereign injury."); *United States v. California*, 2026 WL 784514, at *4 (C.D. Cal. Mar. 18, 2026) (concluding that "[r]ejecting Plaintiff's sovereign injury theory aligns with sound jurisprudence" because otherwise, the United States may sue "any time federal law preempts state law" or even where "the executive or the decisionmakers at the Department of Justice simply do not like a state law because it is in tension with their policies").

### B. The Ills The United States Complains of Are Not Fairly Traceable to the Policy

The United States alleges it is harmed by the Policy because of its need to conduct covert operations and because of the risks of "doxxing" or disclosing the identity of federal agents. Compl. ¶¶ 32-47. Even if those were cognizable injuries in this case, the injuries are not fairly traceable to the Policy. Indeed, there is no "sufficiently direct causal connection between the challenged action and the identified harm." *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (citation and quotation omitted).

As explained above, the public does not have access to the identity of the owner or lessee of a law enforcement vehicle in Massachusetts based solely on the license plate, regardless of whether the license plate is confidential or standard. Accordingly, even if members of the public had inflicted the harms the United States claims, the Policy does not cause those harms. Members of the public cannot trace the owner of standard plates registered to law enforcement vehicles any more than they can trace the owner of confidential plates.[3] Nor can they access any information about the operators of the vehicle regardless of license plate type. And there is no direct causal link between the availability of registration information in non-public databases and the alleged harms that the United States asserts might be inflicted by members of the public.[4] Indeed, the United States makes no attempt to plead allegations explaining how the Policy could cause the harms it

---

[3] Of course, members of the public might be able to identify certain vehicles as operated by ICE by observing ICE agents driving or emerging from those vehicles, and they might further be able to record and disseminate the license plate number on those vehicles. *Cf.* Compl.¶ 43 ("Increasingly, members of the public photograph, film, and publish federal enforcement actions online and include the personal identities of federal officers for the sole purpose of intimidation and harassment."). But that, too, has nothing to do with the Policy, which has no impact either on what members of the public can observe or on what information members of the public can obtain about a particular license plate.

[4] Again, the Policy governs the standards and application procedures applicable to the issuance of confidential license plates. *See* Add. 1. Those confidential plates restrict registration data from appearing in certain non-public databases that are accessible only by local law enforcement and RMV staff. *Id*.

alleges, nor how it could enable bad actors. *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 225 (2021) ("An indirect theory of traceability requires that the government cajole, coerce, command.").

The United States' allegations regarding doxxing of federal agents highlight the causation problems. Although the Complaint discusses "the increasing threats of targeted harassment and retaliation against federal officers and agents[,]" Compl. ¶ 42, and purports that those threats "have increased exponentially," *id.*, two of the sources cited pre-date the challenged Policy,[5] and all the sources are from outside of the Commonwealth. Likewise, the Complaint contains zero allegations that the inability to obtain a confidential license plate ***caused*** a federal agent to be the target of a threat, harassment, or doxxing incident. And it is not plausible that the Policy causes doxxing because the public has no access to registration information for law enforcement vehicles or their operators regardless of whether that vehicle has a confidential or standard license plate. Whatever personal information private third parties are able to obtain about ICE or CBP agents to engage in doxxing, *see supra* n. 3, it is *not* because of the Policy.

Moreover, the Complaint does not tie the United States' alleged injuries to the Policy. Instead, the Complaint refers to private third parties who, according to the United States, want to impede federal investigations or harm federal agents. *See*, *e.g.*, Compl. ¶ 36 ("subjects may destroy evidence, evade apprehension, flee the jurisdiction, take countermeasures that endanger the public, or otherwise alter their behavior"); *id.* ¶ 40 ("hostile actors may track routes, anticipate movements, or attempt to interfere" with federal law enforcement); *id.* ¶ 46 ("criminal actors or hostile

---

[5] The Complaint cites three Department of Homeland Security press releases. *See* Compl. ¶¶ 42-45, nn.4-6. Two are dated October 2025, and while the third is dated March 31, 2026, that one relates to a postcard that was mailed to an ICE officer's neighbors in North Carolina; it, like the others, is irrelevant to the present litigation.

organizations could obtain sensitive information").[6] The existence of these (private) bad actors represents a break in the causal link between the alleged injuries and the challenged Policy. *See*, *e.g.*, *Lujan*, 504 U.S. at 562 ("Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.") (citations and quotation omitted); *Jackson v. City of Houston*, 143 F.4th 640, 645 n.4 (5th Cir. 2025) (injuries sustained by plaintiffs were not traceable to city policy that led to more high-speed pursuits because injuries were caused by fleeing drivers, whose actions were not coerced or determined by the City); *Telephone and Data Systems, Inc. v. F.C.C.*, 19 F.3d 42, 47-48 (D.C. Cir. 1994) (plaintiff lacked standing to contest FCC order combining operations of competitor's business; rejecting argument that combined operations could force plaintiff's company to lower its rates as unadorned speculation based on an impermissible presumption of illegal activities by actors not before the court). For this reason, too, the United States cannot show causation sufficient to establish standing.

### C. The United States' Alleged Injuries Are Not Redressable by a Favorable Decision

For these same reasons, the order the United States seeks from this Court—that the Policy be permanently enjoined—will not redress the alleged injuries. Members of the general public—who the United States fears will cause the injury (disruptions to its mission and doxxing)—have the same access to license plate information for law enforcement vehicles regardless of whether the license plate is confidential or not. *See supra* pp. 1-3. There is simply no order this Court could

6 The Complaint also employs the passive voice and other creative wording to avoid having to say *who* is causing the alleged harm. *E.g.*, Compl. ¶¶ 35 (asserting that "[w]hen an unmarked vehicle can be traced to a federal agency, the negative consequences for federal law enforcement officers can be immediate[,]" but omitting who can trace the vehicle or identify the vehicle as being registered to a federal agency and failing to tie such assertion to the RMV Policy), 36 (asserting that "[i]n the event an investigative vehicle is identified because confidential plates were not issued, subjects may destroy evidence, …." but omitting how a federal vehicle could be identified and not tying that identification to the RMV Policy in any way).

enter relating to the Policy that would redress the United States' claimed injuries. *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court.") (citation and quotation omitted); *see City of Bos.*, 2026 WL 1493706, at *8-10.

## II. The Complaint Should Be Dismissed for Failure to State a Claim

Even if the United States had standing—which it does not—its claims should be dismissed because the United States fails to state plausible claims for relief. Once the Court strips away the speculation and conclusory statements in the complaint—as it must on a Rule 12(b)(6) motion, *see Schatz,* 669 F.3d at 55-56 & n.3 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))—what remains fails, as a matter of law, to state plausible claims that the Policy violates the Supremacy Clause. *First*, the Policy does not violate the intergovernmental immunity doctrine where it does not discriminate against or directly regulate the Federal Government. *See* pp. 12-18. *Second*, forcing the RMV to issue confidential plates would violate anticommandeering principles. *See* pp. 18-20. *Third*, the Complaint makes no allegations against Governor Healey. *See* p. 20.

### A. The Policy Does Not Violate the Intergovernmental Immunity Doctrine

A state policy violates the intergovernmental immunity doctrine if it "'regulate[s] the United States directly or discriminate[s] against the Federal Government or those with whom it deals.'" *Washington II*, 596 U.S. at838 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). The Policy does neither: it regulates local officials and treats all local, state, and federal civil enforcement agencies identically.

#### i. The Policy Does Not Discriminate Against the Federal Government

Count I should be dismissed because the Policy does not discriminate against the Federal Government. A state policy "does not discriminate against the Federal Government … unless it

treats someone else better than it treats them." *Washington I*, 460 U.S. at 544-45. The relevant inquiry is whether the state policy features "differential treatment" of "similarly situated state and federal [actors.]" *Dawson v. Steager*, 586 U.S. 171, 175, 177 (2019).

Here, the Policy does not discriminate against the Federal Government because it treats ICE and CBP the same as all similarly situated civil enforcement agencies. *See* Add. 1. The Policy does not distinguish agencies based on their federal status, but instead, based on whether they primarily engage in civil or criminal law enforcement. *Id.* at 2. Specifically, any government entity may obtain a confidential plate for a government-owned vehicle if "the vehicle is assigned to a law enforcement entity primarily engaged in criminal law enforcement or to a law enforcement entity actively participating in a joint anti-terrorism or criminal task force led by a law enforcement entity primarily engaged in criminal law enforcement" and "the vehicle is used for criminal law enforcement or eligible task force purposes[.]" *Id.* ICE and CBP are generally not eligible for confidential license plates because both agencies primarily engage in civil law enforcement, just as state and local agencies that primarily engage in civil law enforcement are ineligible. This neutral policy does not discriminate against the Federal government. *See, e.g.*, *GEO Grp. v. Inslee*, 151 F.4th 1107, 1120-22 (9th Cir. 2025) (law that regulated civil immigration detention facilities is not discriminatory if identical requirements are imposed on similarly situated civil detention facilities); *contrast Washington II*, 596 U.S. at 839 (law was discriminatory where it facially treated federal workers differently than state or private workers).

The United States advances three reasons why the Policy is discriminatory against the federal government, but each fails. *First*, the United States pleads that "Massachusetts law and existing policies explicitly allow for confidential plates to be issued to state and local officials for civil functions[.]" Compl. ¶ 56; *see id.* ¶¶ 28-29 (citing policy that governs Massachusetts "State

Vehicles and related assets"). In so pleading, the United States relies on the Office of Vehicle Management's ("OVM") confidential plates policy. *Id*. But this reliance does not save the United States' unlawful discrimination claim. OVM manages state-owned vehicles; it has no authority over the issuance of confidential plates or responsibility for the Policy. In any event, OVM makes clear that requests for confidential plates for state vehicles are subject to "submission to the RMV for final authorization." Compl. Ex. C at 7.

*Second*, the United States points to a statement made by Governor Healey about ICE's operations to argue that the policy change was intended to discriminate against federal immigration enforcement. Compl. ¶ 23. Statements by public officials—even ones that criticize the Federal Government—are not relevant to intergovernmental immunity analysis of a facially neutral policy like this one. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968) ("Court[s] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."); *see also Trump v. Hawaii,* 585 U.S. 667, 706 (2018) (discounting President's religiously hostile statements because facially neutral Proclamation had legitimate grounding in national security). Indeed, in the context of intergovernmental immunity, courts do not consider "discriminatory motive, intent, or purpose," but rather "look to the text and inevitable effects of a statute to determine its constitutionality." *United States v. Idaho*, 746 F. Supp. 3d 881, 902 (D. Idaho 2024) (citing *United States v. O'Brien*, 391 U.S. at 384-85); *see also Student Loan Servicing Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 76 (D.D.C. 2018) ("even if the [relevant laws] were enacted with the discriminatory motive that [Plaintiff] alleges, it is insufficient to render the state law discriminatory for purposes of finding a violation of the Supremacy Clause"). For that reason, Governor Healey's statements are irrelevant. *See GEO Grp., Inc. v. City of Tacoma*, No. 3:18-CV-05233-RBL, 2019 WL 5963112, at *6 n.2 (W.D. Wash. Nov. 13, 2019) (statements by city

councilmembers critical of private detention centers and federal immigration agenda were "irrelevant" to analysis of whether ordinance relating to private detention centers was discriminatory). Even if those statements demonstrated a discriminatory motive, that would not render a neutral policy discriminatory for purposes of the intergovernmental immunity analysis. *Id.* ("intergovernmental immunity analysis is not concerned with the potential 'nefarious motive' behind the challenged law") (citation omitted).

*Third*, the United States pleads, based apparently on information and belief, that the RMV "continues to provide confidential plates to state and local officers engaged in civil and criminal enforcement." Compl. ¶ 61. The United States does not provide a single example to support this paragraph. The Policy—which bars *all* federal, state, and local law enforcement agencies primarily involved in civil investigation, with universally available exceptions for participation in joint anti-terrorism or criminal task force work—readily refutes this unsupported allegation. *See Schatz*, 669 F.3d at 55 & n.3. In any event, even if the allegation were correct (it is not), the Complaint must be dismissed as inconsistent with anti-commandeering principles. *See infra* at pp. 18-20.

**ii. The Policy Does Not Regulate the Federal Government**

A state policy violates the intergovernmental immunity doctrine "if it regulates the United States directly." *North Dakota*, 495 U.S. at 435 (plurality opinion). Under a formalist approach, direct regulation occurs when a State "places a prohibition on the Federal Government." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). Some Circuits have adopted more functionalist approaches, wherein a state policy directly regulates the Federal Government if it substantially interferes with or controls federal operations. *North Dakota*, 495 U.S. at 452 (Brennan, J. concurring); *see, e.g.*, *CoreCivic v. Governor of New Jersey*, 145 F.4th 315, 322-25 (3rd Cir. 2025); *Texas v. Dep't of Homeland Security*, 123 F.4th 186,

206 (5th Cir. 2024).

The First Circuit has not adopted either approach, but that is of no consequence here, as the United States' claims fail under either. *First,* under a formalist approach, the Policy does not directly regulate the United States because it does not place any prohibition on the Federal Government. Instead, the Policy directs RMV employees (state workers) as to whom they can issue confidential license plates. *See* Add. 1. Thus, the Policy does not directly regulate the United States because it is directed at the conduct of state workers who issue confidential license plates, not the United States or its agents, and the Policy does not purport to regulate any federal activity. *See United States v. California*, 921 F.3d 865, 875, 880 (9th Cir. 2019) (law requiring employers to inform employees of upcoming ICE inspections and provide results of such inspections with employees who might lack work authorization did not violate intergovernmental immunity where it is "directed at the conduct of *employers*, not the United States or its agents, and no federal activity is regulated"); *see also United States v. State of Minnesota*, No 25-CV-3798, at *52-53 (D. Minn. July 20, 2026) (finding no violation of intergovernmental immunity where the challenged laws only impacted "how state and local officials perform their duties").

The United States alleges that the Policy "directly regulates a core government function by telling federal law enforcement that they cannot obtain essential confidential plates because Massachusetts disapproves of their federal function." Compl. ¶ 62. To be sure, a consequence of the Policy is that certain local, state and federal agencies, including ICE and CBP, cannot obtain confidential license plates. *See* Add. 1. However, the fact that the policy *impacts* federal agencies does not mean it *directly regulates* them. *See, e.g., McHenry Cnty.*, 44 F.4th at 593 (statute prohibiting local and state law enforcement agencies from entering into immigration detention agreements with ICE did not directly regulate United States despite the fact that "a consequence

of the Act—*the* intended consequence of the Act—is that the federal government will not be able to use cooperative agreements to house immigration detainees in Illinois State or county facilities"); *California*, 921 F.3d at 881 (explaining that intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment"). Instead, where the Policy only places a direct prohibition only on the actions of state officials, it does not directly regulate the United States.

*Second*, under a functionalist approach, the Policy does not directly regulate the United States as it does not substantially interfere with or control ICE or CBP's operations. The United States vaguely asserts that the Policy regulates the Federal Government "by dictating how federal agents may do their jobs in Massachusetts." Compl. ¶ 63. Not so. As explained, *supra* pp. 9-11, the Policy does not impede ICE's operations where the harms alleged—*e.g.*, doxxing—are not fairly traceable to the Policy. Moreover, any alleged impact does not rise to the level of substantial interference with (or control of) the Federal Government's operations. ICE's core functions include investigating, detaining, and removing individuals who are present in the United States in violation of civil immigration law. *See*, *e.g.*, 8 U.S.C. § 1357(a)(3). Nothing about the Policy impedes this mission, especially because ICE and CBP can operate in Massachusetts with standard license plates, which—like confidential license plates—restrict registrant and lessee information from public access. *See supra* pp. 1-3. The use of standard license plates does not substantially interfere with or control the Federal Government's operations. *See, e.g., Nwauzor v. GEO Grp.*,127 F.4th 750, 761-62 (9th Cir. 2025) (application of minimum wage statute to federal immigration detainees does not directly regulate the Federal Government as it did not forbid the Federal Government from operating private detention centers, interfere with or dictate federal decisions, or conflict with federal requirements); *Inslee*, 151 F.4th at 1116-17 (statute requiring

private detention facilities to meet certain conditions did not directly regulate Federal Government because it does not prohibit use of private contractors, limit ability to detain, override federal contracting decisions, or increase costs for Federal Government).

**B. Forcing The RMV To Issue Confidential License Plates to Federal Civil Agencies Would Violate the Anticommandeering Principle of the Tenth Amendment**

Accepting the United States' position would violate the anticommandeering principle reflected in the Tenth Amendment, under which "'[t]he Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)). This principle is fundamental to both the federal system and democratic accountability because "'a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front[,]'" *New York v. United States*, 505 U.S. 144, 181-82 (1992) (*quoting Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)), including by "promot[ing] political accountability" and "prevent[ing] Congress from shifting the costs of regulation to the States," *Murphy*, 584 U.S. at 473, 74 (citations omitted). As a result, although the federal government may disagree with a state's choices regarding the use of state facilities or allocation of state resources, that is "not the province of the national authorities to determine." *Patterson v. Kentucky*, 97 U.S. 501, 504 (1878).

Here, the United States concedes it seeks confidential license plates to aid its immigration enforcement efforts, which is "an exclusive federal power." Compl. ¶ 2. But under anticommandeering principles, Massachusetts can refuse to aid the United States' immigration enforcement efforts by declining to provide state resources (*i.e.*, confidential plates) to ICE and CBP. *See, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("the Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration

enforcement"); *United States v. New York*, 810 F. Supp. 3d 329, 354 (N.D.N.Y. Nov. 17, 2025) (statute and executive order that restricted certain federal activities in state courthouses and facilities "implement[ed] New York's permissible choice not to participate in federal civil immigration enforcement") (citations omitted). To hold that Massachusetts cannot refuse to provide confidential plates would mean that Massachusetts *must* aid the Federal Government in its immigration enforcement efforts, in direct contravention of the anticommandeering principle reflected in the Tenth Amendment. *See California*, 921 F.3d at 876, 888 (law restricting information sharing with federal immigration authorities did not violate intergovernmental immunity; holding otherwise "would imply that California *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule[,]" even if the statute "obstructs federal immigration enforcement"). In addition, invalidation of the Policy "would *not* prevent obstruction of the federal government's activities, because the INA does not require any particular action on the part of [Massachusetts] or its political subdivisions." *Id.* at 889.

In short, Massachusetts has made the policy decision to limit confidential license plates to federal, state, and local law enforcement agencies primarily involved in criminal law enforcement investigations. By virtue of this decision, Massachusetts is exercising its constitutional prerogative to "decline to administer [a] federal program," namely, the enforcement of federal civil immigration law. *New York*, 505 U.S. at 177. The United States, by this lawsuit, is seeking to compel Massachusetts to reverse course, but the United States' position is "fundamentally incompatible with our constitutional system of dual sovereignty." *Printz*, 521 U.S. at 935. If the United States were to prevail, Massachusetts would aid in immigration enforcement only because they have been "commanded to do so," and it would be forced to expend scarce resources to

cooperate with federal immigration. Anticommandeering principles forbid these outcomes. *Murphy*, 584 U.S. at 473-74.

**C. The United States Does Not Plead Allegations Against Governor Healey.**

The Complaint fails to set forth ***any*** factual or legal bases for including Governor Healey as a defendant, and she should therefore be dismissed. Even if this Court were to conclude that relief is warranted (it is not), such relief would be available from some other remaining defendants. *See Wright v. Massachusetts Dep't of Public Health*, Case No. 3:22-CV-11936, ECF No. 47 (D. Mass. Mar. 15, 2024). But even setting that aside, a state officer is a proper defendant only where "that officer has some connection with the enforcement of the statute in connection." *New Progressive Party v. Hernandez Colon*, 779 F. Supp. 646, 652 (D.P.R. 1991), *citing Ex parte Young*, 209 U.S. 123, 28 (1908). Here, the Complaint contains no allegations that Governor Healey has any connection with the enforcement of the challenged Policy. There is no allegation sufficient to state "a plausible claim for relief," *Iqbal*, 556 U.S at 678-79, nor any alleged injuries traceable to her as a defendant, *Lujan*, 504 U.S. at 560-61. Accordingly, the United States' claims cannot proceed against the Governor. *See, e.g., McLeod v. Dukakis*, No. 89-0108, 1990 WL 180708, at *1 (D. Mass. Nov. 2, 1990).

**CONCLUSION**

For the reasons set forth above, the Complaint should be dismissed, with prejudice.

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS; MAURA HEALEY, Governor of Massachusetts, in her official capacity; PHILLIP ENG, Interim Secretary of Transportation, in his official capacity; COLLEEN OGILVIE, Registrar of Motor Vehicles, in her official capacity,

By their Attorneys,

*/s/ Tasha J. Bahal*
Tasha J. Bahal, BBO #675935
*Deputy State Solicitor*
Erin E. Fowler, BBO #707188
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1698
Tasha.Bahal@mass.gov
Erin.E.Fowler@mass.gov
(617) 963-2066

July 31, 2026